(17 App. Div. 365.)

KNOX v. EDEN MUSEE AMERICAIN CO., Limited.

(Supreme Court, Appellate Division, First Department.    May 7, 1897.)

MASTER AND SERVANT—LIABILITY OF MASTER FOR DISHONESTY OF SERVANT.

An employer is not negligent in not knowing or suspecting the dishonesty of an employé, who for several years had performed his duties honestly and faithfully, so as to render him (the employer) liable to a person whom the employé, by virtue of his employment, was enabled to defraud, though the dishonesty could easily have been detected by an inspection of the books.

O'Brien, J., dissenting.

Appeal from judgment on report of referee.

Action by Edward M. Knox against the Eden Musee Americain Company, Limited.    There was a judgment in favor of plaintiff, and defendant appeals.    Reversed.

Argued before RUMSEY, WILLIAMS, O'BRIEN, INGRAHAM, and PARKER, JJ.

George W. Seligman, for appellant.
Henry D. Hotchkiss, for respondent.

WILLIAMS, J.    The action was brought to recover damages alleged to have been sustained by plaintiff by reason of the negligence of the defendant with reference to three certificates of stock which had been surrendered for the purpose of transferring the stock.    The defendant's business consisted of the exhibition of wax figures and the giving of entertainments and concerts in West Twenty-Third street, New York City.    In 1891, Theodore Hillman was its president, Louis Windmuller was its treasurer, and James W. Monk was its secretary.

Ernest Andre Jurgens went into defendant's employ in January, 1888, and was formally appointed superintendent of the Eden Musee proper March 17, 1888, and had charge of the wax figures and musical entertainments and the defendant's employés and books, and of the office generally. Among the books in his charge were the check book, the stock certificate book, and the stock transfer book, and his duty included the filling out of checks and certificates of stock, and making entries in the check book showing the moneys deposited to the defendant's credit in its bank of deposit. On May 8, 1891, he was appointed manager, and remained in this position until he left defendant's employ in October, 1891. Frank W. Reynolds was in the defendant's employ from 1884 or 1885 until October, 1891. In April, 1891, the firm of Seligburg & Co., of which Hillman, defendant's president, was a member, held four certificates of stock in defendant's company, of five shares each, worth $80 per share. One Siebrecht made Hillman an offer for this stock, through Jurgens, which the firm accepted. Hillman took the certificates, indorsed by the persons named therein respectively, three in blank and the fourth to the order of the firm, to the defendant's office, and, learning that the purchaser was not ready to pay for the stock, he left the certificates in the office safe, under the sole care and control of Jurgens, to be canceled by him when the purchaser paid for the stock. April 27, 1891, the purchaser gave his check for the stock to Jurgens, who sent it to Hillman with a new certificate for 20 shares, completely executed, except the signature of Hillman as president. Hillman received the check, and signed his name as president to the certificate, and returned it to Jurgens. A by-law of the company provided: "All certificates exchanged or returned to the company shall be canceled by the secretary, and such canceled certificates pasted in their original places in the certificate book, and no new certificate shall be issued until the old certificate has been thus canceled and returned to its original place in said book. Transfers of shares shall only be made upon the books of the company by the holder in person, or by power of attorney duly executed and acknowledged and filed with the secretary of the company, or on surrender of the certificate or certificates of such shares." These four certificates were not canceled by Jurgens or pasted in the stock certificate book at the time the new certificate was issued. Jurgens was the only person who had the combination of the safe. The four certificates were kept in the safe until May 8, 1891, when Reynolds applied to this plaintiff for a loan of $2,500 to himself and Jurgens, upon a note made by him and indorsed by Jurgens. Plaintiff refused to make the loan without security, and thereupon these four certificates, which Jurgens took from the safe and delivered to Reynolds for the purpose, were pledged to plaintiff as security for the loan. The loan was thereafter paid in part and renewed in part, and there remains unpaid thereon $1,800, besides some interest. In October, 1891, it was discovered that Jurgens and Reynolds had been misappropriating the moneys of the company, and they left its employ. Until that time the company had perfect confidence in the honesty of these men, had trusted Jurgens with property of great value, and confided to him substantially the entire management

of its business.    He was made manager on the very day that this loan was made, and these certificates were pledged as security therefor. Hillman supposed the four certificates were canceled and put in the certificate book when the new certificate was issued, and did not discover the contrary until after Jurgens left the company's employ. The secretary never, while Jurgens was in the defendant's employ, attended to any of the details of the transfer of stock, the surrender and cancellation of the old certificates, and the issue of new certificates. All but the signing of the certificates was left for Jurgens to look after.    None of the officers examined the stock certificate book to see whether these certificates had been canceled and placed therein or not.

This case has been twice tried.    The first trial resulted in a judgment for plaintiff (25 N. Y. Supp. 164), which was affirmed by the supreme court at general term (26 N. Y. Supp. 482), but reversed by the court of appeals, a new trial being ordered (42 N. E. 988).    A good many things were determined by the court of appeals which were binding upon the referee upon the second trial, and which must be followed here.    The four certificates were not negotiable so far as to protect the plaintiff's title as holder thereof acquired through Jurgens, who, in effect, stole them.    Jurgens was in no sense the agent of the defendant, authorized to negotiate the securities.    The defendant is not chargeable with negligence, so as to render it liable for damages suffered by the plaintiff by the unauthorized use of the certificates, based upon the fact that, in violation of the by-laws, it permitted the certificates to remain uncanceled and in its safe, to which Jurgens had access, and thereby enabled him to take and use them, or that the company neglected to exercise a proper supervision over its business and its employés, and committed to Jurgens the management of its affairs without special inquiry into the manner in which he discharged his duties, unless it be shown that the defendant knew that Jurgens was dishonest, or had reasons to suspect his dishonesty. These propositions were established by the decision of the court of appeals in this case, and they left no opportunity for the plaintiff to establish a right to recover upon a second trial, except by showing that the defendant knew or had reason to suspect that Jurgens was dishonest before the time he took and used these certificates.    There was no proof of Jurgens' dishonesty, or of defendant's knowledge or reason to suspect it, given on the first trial.    Upon the second trial evidence upon this subject was given, and upon this evidence the plaintiff was again permitted to recover his damages, and this decision by the referee we think was erroneous.

We need not consider the evidence with reference to Jurgens' dishonesty before he went into the defendant's employ, and the defendant's alleged information with reference thereto, because all that evidence was discredited and disregarded by the referee.    We come to the precise ground upon which the decision of the referee was based. We do not understand it to be claimed that the defendant or its officers had actual knowledge of Jurgens' dishonesty, or actually suspected it, before the certificates were misappropriated.    The claim is that they had reason to suspect it.    It will be remembered that Jurg-

ens entered the defendant's employ in January, 1888, and was made superintendent of its property and business March 17, 1888. From that time down to March 1, 1891,—three years,—he served the defendant faithfully, and was guilty of no dishonesty. About March 1, 1891, he began to misappropriate defendant's moneys, and continued to do this steadily down to the time discovery was made in October, 1891. It seems that moneys received for tickets of admission to the museum amounted to $300 to $500 per day. These moneys came into the hands of Jurgens, who put them in the safe over night and then delivered them to Reynolds, whose duty it was to deposit them in the bank and have the amounts entered upon the bank pass book. This book was then delivered to Jurgens, who made the entries of deposits upon the check book. The man in the box office informed Jurgens each day of the amount of the receipts for the day by sending him a slip with the amount thereon. The entries upon the check book were made to agree with the slip from the box office, but the deposits entered upon the bank pass book were less, by reason of the amount taken by Jurgens from the actual receipts of the box office before the money was sent to the bank for deposit. An examination of the bank pass book and the check book, and a comparison of the entries therein of deposits for each day, would have disclosed the discrepancy, and very likely the cause of it,—the misappropriation of moneys by Jurgens. No such examination was made until October, 1891. The total amount then misappropriated since March 1, 1891, was found to be several thousands of dollars. The officers of the defendant did not know or suspect that Jurgens was misappropriating their money before the certificates were taken and used; indeed, they did not know or suspect it until October, 1891. Had they reason to suspect it prior to the taking or using of the certificates? Again, it is said that the account at the bank, made up of these deposits and the checks drawn against the deposits, was overdrawn, as early as February 7, 1891; that April 8, 1891, the overdraft amounted to $5,-000, on April 9, 1891, to $1,500, on April 27, 1891, to $1,700, and May 6, 1891, to $1,000,—not that these various sums were overdrawn by specific checks for such amounts, but at these dates these were the amounts of overdrafts then appearing on the books. Notices of these overdrafts were sent to defendant's office, and came into Jurgens' hands, and were suppressed by him. A notice of the $5,000 overdraft was sent to the defendant's treasurer also, and some correspondence and talk was had between the bank cashier and the defendant's treasurer about it, but nothing about overdrafts at any other time. The treasurer, on receipt of this notice, went to Jurgens about it. Jurgens told him that he could not make deposit of certain moneys in time, as he had expected to do; that he had made the deposit since, and it was all right. The treasurer accepted the explanation, which seemed to him satisfactory. He did not inquire into the details of the matter, did not suspect any dishonesty on Jurgens' part.

These are facts upon which the referee found that the defendant had reason to suspect Jurgens of dishonesty prior to the time the certificates were taken and used, May 8, 1891. Jurgens had been honest and faithful to every trust reposed in him from January, 1888, to

March, 1891. He had then been dishonest from March till May. The officers of the defendant did not actually know or suspect him of this dishonesty during this short time; and yet it is said they had reason to suspect it. Why? Because they might have discovered it if they had exercised more supervision over their employé and the business he was transacting; they might have discovered it if the books had been examined and the entries therein compared; their want of knowledge or suspicion was the result of their own negligence; they should have exercised care in the supervision of the acts and conduct of their employé, to whom they intrusted in a large degree the management of their business; their suspicion should have been aroused by the notice of the amount overdrawn in their account April 9, 1891. This is the theory upon which the referee allowed a recovery for plaintiff on this second trial, and in his opinion he enlarges upon the matter to a considerable extent; but it seems to us he is in direct conflict with the views of the court of appeals expressed in this case. It was said by the court of appeals that: "It is not generally an omission of ordinary prudence that an employer deals with his employés on the assumption that those who have hitherto been faithful in the performance of their duty will continue so to be, or because he does not anticipate and provide against the possibilities of their criminal acts. Breaches of trust and confidence unfortunately are not infrequent. It is one thing to say that a man shall be amenable for such immediate consequences of his acts as a reasonable man might foresee and dread and therefore shun; but it is another and very different proposition to maintain that a man shall forfeit his property because he has done an act which will not be perilous unless others are guilty of misconduct, which that act does not cause." And the court of appeals held that a failure to examine the stock certificate book by the officers of the defendant after the issue of the new certificate was not negligence, although the most casual examination would have discovered that Jurgens had not canceled the certificates and placed them in the book where they belonged; the court saying: "The president had reason to suppose that Jurgens would obey his directions and cancel the certificates, and the omission to inquire whether he had done so during the period mentioned is, we think, quite insufficient to support the charge of negligence." We think there was no evidence which justified the referee in finding that the defendant had reason to suspect Jurgens of dishonesty while it left the certificates in question in the safe which he had charge of. The officers had a right to rely upon the honesty of an employé who had served them faithfully for more than three years, and were not negligent because they did not look upon him with suspicion, and watch him, as though expecting him at any time to become dishonest and unfaithful. Their confidence in him on the very day of the misappropriation of these certificates—May 8, 1891— was shown by their making him on that day the manager of the whole business. While some men are dishonest, most men are honest. The business of the world is based upon the confidence that men place in each other. The law does not encourage distrust and suspicion. We should not charge negligence based upon confidence and trust in

men who have been uniformly honest and trustworthy. There are other questions suggested on this appeal, but we prefer to base our decision upon the main question argued, that there was no adequate proof of negligence on the part of the defendant to warrant a recovery of damages by the plaintiff.

The judgment should be reversed, and a new trial ordered, with costs to appellant to abide event.

RUMSEY, INGRAHAM, and PARKER, JJ., concur.

O'BRIEN, J.    For reasons given by referee, I dissent.